## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

DANTE SAVAGE,                          *

    Plaintiff,                    *

    v.                            *

                                            CIVIL NO. JKB-19-2482

FEDERAL HOME LOAN MORTGAGE *
CORPORATION, *et al.*,

    Defendants.                   *

  *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM

In 2019, Plaintiff Dante Savage filed a Complaint against a number of Defendants. The Defendants had owned two properties in which Plaintiff resided in the early 2000s and was allegedly exposed to lead. One of those Defendants was the Federal Home Loan Mortgage Corporation ("FHLMC"), the only Defendant remaining in this case. Now pending before the Court is the FHLMC's Motion for Summary Judgment (ECF No. 61), the FHLMC's Motion to Strike the Affidavit of Theatra Bowman (ECF No. 63), and the FHLMC's Motion to Strike Unsworn and Inadmissible Expert Reports (ECF No. 64). The motions are fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2021). For the following reasons, the FHLMC's Motion for Summary Judgment (ECF No. 61) and Motion to Strike the Affidavit of Theatra Bowman (ECF No. 63) will be granted, and the FHLMC's Motion to Strike Unsworn and Inadmissible Expert Reports (ECF No. 64) will be denied as moot.

### I.    *Background*

Plaintiff was born on April 8, 2001. In August 2002, Plaintiff was diagnosed with plumbism (lead poisoning) and admitted to Mt. Washington Pediatric Hospital for chelation

therapy. (Opp. Summ. J. Ex. 5, ECF No. 62-8.) At the time, Plaintiff was residing at two addresses in Baltimore: 2304 E. Lafayette (the "Property") and 414 W. 28th Street. (Compl. ¶¶ 3(a)–(b), ECF No. 4.) As a result of Plaintiff's diagnosis, the Baltimore City Health Department (the "Health Department") performed lead inspections at both homes. The Property was deemed "lead safe" on August 28, 2002, with the Health Department determining that its "analysis indicates all areas tested are below pb threshold limit." (Mot. Summ. J. Ex. 5, ECF No. 61-8.) In contrast, the Health Department identified a number of lead paint violations at the 414 W. 28th Street home and issued an Emergency Violation Notice and Order to Remove Lead Nuisance. (Mot. Summ. J. Ex. 6 at 4–6, ECF No. 61-9.) The parties dispute the amount of time Plaintiff was spending at each of the homes during this period, but in either late 2002 or early 2003, Plaintiff moved from the Property. (*Compare* Mot. Summ. J. Mem. Supp. at 11 (arguing that Plaintiff's mother moved from the Property to 1641 Dartford Road on October 15, 2022), ECF No. 61-3, *with* Opp. Summ. J. Mem. Supp. at 6 (emphasis in original) ("[A]ll of the medical records indicate that Plaintiff resided at the [ ] Property with his mother until *at least* January 23, 2003."), ECF No. 62-2.)

After diagnosis and treatment, the lead levels in Plaintiff's blood steadily decreased for about a month, falling from 58 micrograms per deciliter (mcg/dl) on August 16, 2002, to 14 mcg/dl by September 6, 2002. (*See* Maryland Department of the Environment Report at 4, Mot. Summ. J. Ex. 24, ECF No. 61-27.) It then rose back to 19 mcg/dl on September 24, 2002, before declining back to 14 mcg/dl by early 2003. (*Id.*) More infrequent testing shows that Plaintiff's blood levels continued to decrease throughout the remainder of his life. (*Id.*) Although Plaintiff's blood-lead levels are now negligible, he asserts that he suffers from permanent neurological damage due to the elevated lead levels he experienced in early childhood. (Compl. ¶ 9.) Plaintiff further alleges

that these injuries were caused by lead exposure at both the Property and at 414 W. 28th Street. (*Id.* ¶ 11.)

### A. FHLMC's Foreclosure of the Property

At the time Plaintiff was diagnosed with plumbism, the Property was owned by Dorothy Carroll, a former Defendant. (*See* ECF No. 16 (order dismissing Carroll).) Carroll rented the Property to Plaintiff's maternal grandparents, Irene and Bruno Powell. In late 2002, Carroll defaulted on her mortgage with Bank of America, N.A. Bank, the holder of a mortgage note guaranteed by the FHLMC. (Mot. Summ. J. Mem. Supp. at 5.) A judicial foreclosure was commenced against Carroll, which ultimately concluded in a public sale of the Property. (Opp. Mot. Summ. J. Ex. 2, ECF No. 62-5.) Because there were no other bidders at the foreclosure sale, the property returned to the FHLMC as the guarantor investor. (Oliver Dep. at 37, Mot. Summ. J. Ex. 4, ECF No. 61-7.) The sale to the FHLMC occurred on September 11, 2002, and was ratified by the Circuit Court for Baltimore City on October 18, 2002. (Opp. Mot. Summ. J. Ex. 6, ECF No. 62-9.)

On November 18, 2002, the FHLMC filed a Motion for Judgment Awarding Possession of the Property, (Mot. Summ. J. Ex. 10, ECF No. 61-13), and on December 3, 2002, the Circuit Court for Baltimore City ordered that "Carroll, or other persons concerned, show cause on or before the 3rd day of January, 200[3]" why possession should not be awarded to the FHLMC. (Mot. Summ. J. Ex. 9 at 6, ECF No. 61-12.)

A Writ of Possession was subsequently issued by the Clerk for the Circuit Court for Baltimore City on January 28, 2003. (Mot. Summ. J. Ex. 11 at 5, ECF No. 61-14.) That Writ was executed on April 25, 2003, placing the FHLMC in possession of the Property as of that date. (Mot. Summ. J. Ex. 13, at 5–6, ECF No. 61-16.) Plaintiff's relatives had previously vacated the

3

Property and moved across the street to 2305 E. Lafayette. (Walker Dep. at 36–37, Mot. Summ. J. Ex. 14, ECF No. 61-17.)

### B. Procedural Background

In May 2019, Plaintiff brought suit against various Defendants who had ownership interests in the Property and in 414 W. 28th Street, namely: the Estate of Roseanne Veiga, the Estate of Katherine Webb, Intercoastal Investment Trust, LTD., the Estate of Dorothy Carroll, and the FHLMC. (Compl. at 2–3.) Plaintiff's Complaint asserted claims for negligence, violations of state and local consumer protection acts, and negligent misrepresentation. (*See generally id.*) On August 28, 2019, the FHLMC removed the case to this Court under 28 U.S.C. § 1442(a)(1). (*See* ECF No. 1); *see also* 12 U.S.C. § 1452(f) (confirming that the FHLMC is an "agency included in sections 1345 and 1442 of such title 28").

In proceedings before this Court, all other Defendants have been terminated from this action (*see* ECF Nos. 16, 17, 29, 38), leaving only Plaintiff's negligence claim against the FHLMC in dispute. On June 21, 2021, the FHLMC moved for summary judgment on that claim, arguing that discovery had adduced no genuine disputes of material fact and that it was entitled to judgment as a matter of law. (ECF No. 61.) Plaintiff opposed, arguing that there were various disputes of material fact that precluded resolution of this case at summary judgment. (ECF No. 62.) Amongst Plaintiff's Opposition Exhibits were an affidavit of Plaintiff's mother, Theatra Bowman, and three expert reports by Dr. Alma Robinson-Josey, Dr. Miguel Rodriguez, and Laurence Brand. (*See* ECF Nos. 23, 24, 31, 36, 38.)

The FHLMC moved to strike those exhibits, arguing that (1) the affidavit of Theatra Bowman was inadmissible hearsay; and (2) Plaintiff's expert reports are unsworn and inadmissible. (*See* ECF Nos. 63, 64.) While Plaintiff conceded that it was appropriate to strike

4

Bowman's affidavit (*see* ECF No. 69), he opposed the FHLMC's motion to strike the unsworn expert reports. (*See* ECF No. 76.) As part of that opposition, Plaintiff filed affidavits by his three experts each of whom "adopt[ed], and incorporate[d] by reference, the contents of [their reports]" and indicated that they "intend[ed] to testify at trial in this case as to the matters set forth in [their reports]." (*See* ECF Nos. 70-1, 70-2, 70-3.) These affidavits were sworn and affirmed under penalty of perjury. (*Id.*)

## II.   Legal Standard

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a party carries this burden, then the court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented, and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. To carry these respective burdens, each party must support its assertions by citing specific evidence from the record. Fed. R. Civ. P. 56(c)(1)(A). The court will assess the merits of a summary judgment motion, and any responses, by viewing all facts and making reasonable inferences in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

### III.   Analysis

Under Maryland law, to establish a claim for negligence a Plaintiff must show: "(1) that the defendant was under a duty to protected the plaintiff from injury, (2) that the defendant breached that duty, (3) that the defendant's breach of the duty proximately caused the loss or injury suffered by the plaintiff, and (4) that the plaintiff suffered actual loss or injury." *Troxel v. Iguana Cantina, LLC*, 29 A.3d 1038, 1049 (Md. Ct. Spec. App. 2011).  At summary judgment, a plaintiff alleging negligence in relation to lead-based paint exposure can satisfy these elements and "make out a *prima facie* case of negligence based upon a violation of the Housing Code by demonstrating (1) violation of a section of the Housing Code 'designed to protect a specific class of persons which include the plaintiff,' and (2) 'that the violation proximately caused the injury complained of.'" *Rogers v. Home Equity USA, Inc.*, 160 A.3d 1207, 1215 (Md. 2017) (citation omitted).  The Maryland Court of Appeals has confirmed that Sections 702 and 703 of the Housing Code "were enacted to protect children from lead-based paint poisoning." *Id.*  Accordingly, "[w]here there is evidence that the violation of th[ose] statute[s] proximately caused the plaintiff's injury" that evidence "is sufficient [ ] to warrant the court in submitting the case to the jury on the question of the defendant's negligence[,]" leaving it to the trier of fact to "evaluate whether the actions taken by the defendant were reasonable under all the circumstances." *Brooks v. Lewin Realty III, Inc.*, 835 A.2d 616, 621 (Md. 2003) (citations omitted).

The FHLMC argues that it is entitled to summary judgment because Plaintiff has failed to establish any aspect of a *prima facie* case.  Specifically, it argues that Plaintiff has failed to show (1) that the FHLMC owed Plaintiff any duty under the Housing Code; (2) any breach of the Housing Code; and (3) that any lead exposure resulting from the Property was the proximate cause of Plaintiff's injuries.  The Court concludes that, while Plaintiff has established the FHLMC owed

6

a duty under the Housing Code from the date the foreclosure sale was ratified, he has failed to

proffer more than a scintilla of evidence on breach and causation. As such, the Court must grant

the FHLMC summary judgment on Plaintiff's negligence claim.

### A. Duty

The FHLMC argues that Plaintiff's claim fails at the threshold because it owed Plaintiff no

duty, under the Housing Code or otherwise. It argues that the evidence in this case precludes

Plaintiff from establishing that the FHLMC owed him a duty for three reasons. First, the FHLMC

contends that it owed no duty until it had a right to access the Property on April 25, 2003. (Mot.

Summ. J. Mem. Supp. at 15.) Second, it argues that it owed no duty to the tenants at the Property

because it was not engaged in a landlord-tenant relationship with them. (*Id.* at 14.) Last, it argues

that it owed no duty to Plaintiff specifically, because Plaintiff was not living at the Property during

the time that the FHLMC owned the Property. (*Id.* at 16.) None of these arguments warrant

summary judgment.

### 1. Duties under the Housing Code

As noted, the FHLMC's first two arguments address the scope of its duties under the

Housing Code. At the time of the salient events in this case, "[t]he Housing Code established the

class of individuals who were required to follow the Code's provisions. According to the Code,

any 'owner or operator of a property subject to this Code shall be responsible for compliance with

all of the provisions of the Code.'" *Allen v. Dackman*, 991 A.2d 1216, 1223 (Md. 2010) (quoting

Balt. City Code Art. 13 § 310(a)). The code further defines an owner as:

> any person, firm, corporation, guardian, conservator, receiver, trustee, executor, or
> other judicial officer, who, alone or jointly or severally with others, owns, holds, or
> controls the whole, or any part, of the freehold or leasehold title to any dwelling or
> dwelling unit, with or without accompanying actual possession thereof, and shall
> include in addition to the holder of legal title, any vendee in possession thereof, but

7

shall not include a mortgagee or an owner of a reversionary interest under a ground rent lease.

*Stedman v. Turk for Estate of Wartzman*, 2018 WL 5881751, at *4 (Md. Ct. Spec. App. Nov. 9, 2018) (quoting Balt. City Code Art. 13 § 105). The FHLMC argues that it did not become an "owner" under the Housing Code until it acquired possession of the property in April 2003. (*See* Mot. Summ. J. Mem. Supp. at 15.) In contrast, Plaintiff argues that "[a]s of October 18, 2002, when the Final Sale was ratified, [the FHLMC] was the owner of the [ ] Property." (Opp. Mot. Summ. J. at 8.)

### a. FHLMC's Ownership of the Property

Under the plain terms of the Housing Code, an owner includes the "holder of legal title." Balt. City Code Art. 13 § 105. However, "in Maryland, legal title does not pass until the deed is executed and recorded." *Standard Fire Ins. Co. v. Berrett*, 910 A.2d 1072, 1082 (Md. 2006). Prior to the deed being executed and recorded, a foreclosure purchaser acquires "inchoate equitable title" at the time of the foreclosure sale. *See Huertas v. Ward*, 214 A.3d 1, 10 n. 5 (Md. Ct. Spec. App. 2020). Then, "[w]hen the court finally ratifies a sale, the purchaser acquires complete equitable title to the property and becomes the substantial owner of the property." *Id.* at 10. Neither party offers authority for whether the holder of *equitable* title is an owner under the Housing Code as a matter of law.

That said, the Maryland Court of Special Appeals' construction of the term "unit owner" in the Maryland Condominium Act strongly suggests that the holder of equitable title as a result of a foreclosure sale is an "owner" for purposes of the Housing Code. *See Campbell v. Council of Unit Owners of Bayside Condominium*, 32 A.3d 149 (Md. Ct. Spec. App. 2011). Like the Housing Code, the Condominium Act explicitly defined an "owner as a person holding *legal* title." *Id.* at 155 (emphasis in original). However, the Court pointed out that various "authorities [establish]

8

that the purchaser at a foreclosure or judicial sale is in a unique position because of the particular nature of those transactions." *Id.* at 154. Due to these unique circumstances, the Court of Special Appeals concluded that, despite its plain language, "the term 'unit owner' [also] embraces a holder of equitable title, whose rights are virtually ironclad so long as she fulfills her obligations under the terms of the foreclosure." *Id.*

It does not appear, however, that the Maryland Courts have applied (or declined to apply) a similar construction to the term "owner" in the Housing Code. The propriety of this analogy also need not be dispositively resolved here, because the Court later concludes that the facts of this case fail to establish a genuine dispute of fact as to breach or causation. *See infra* Parts III.B, III.C. Accordingly, the Court will assume, *arguendo*, that the FHLMC was the owner of the Property as of October 18, 2002. Though this assumption confirms that there is a genuine dispute of fact as to whether the FHLMC owed Plaintiff a duty, Plaintiff's failure on breach and causation ultimately renders that dispute immaterial for purposes of summary judgment.

### b. Lack of Landlord-Tenant Relationship

The FHLMC also argues that it did not owe Plaintiff a duty because the duties imposed by the Housing Code apply only to a landlord-tenant relationship and that "[i]n the absence of any evidence that [the FHLMC] rented the [Property] to the plaintiff or his family, [the FHLMC] cannot be held to have owed, let alone breached, any duty to the Plaintiff under any City Housing Codes." (Mot. Summ. J. Mem. Supp. at 15.) This argument has been squarely rejected by the Court of Appeals of Maryland. In *Allen*, the defendant argued that he "was not a landlord to [plaintiffs] and had no legal obligation to them." *Allen*, 991 A.2d at 1232 n. 20. The Court of Appeals concluded that this fact did not warrant summary judgment in favor of the property owner. Rather, it found that "[t]he dispositive factor in the present case is that a reasonable trier of fact

9

could find that [plaintiffs] occupied the property, that [defendant] 'owned' the property as that term was defined by the Housing Code, and that [defendant] participated in the tort alleged in this case." *Id.* Assuming those three points are established, the intent, *vel non*, of the property owner to lease the property is simply irrelevant to the analysis at summary judgment. While the lack of a landlord-tenant relationship may be salient to the trier of fact's determination that a defendant "acted reasonably under the circumstances of the case," the lack of this relationship cannot preclude the case from reaching the trier of fact. *Id.* at 1227.

### 2. *Duty to Plaintiff*

The FHLMC further argues that, even if it owed a duty to persons residing at the Property at the time the foreclosure sale was ratified, this duty did not extend to Plaintiff because he was not residing at the Property in late 2002. In support of this view, the FHLMC principally relies on a 2005 Report of Master and Findings of Fact related to a modification of the custody and child support arrangement between Plaintiff's parents. (*See* Furnari Report, Mot. Summ. J. Ex. 22, ECF No. 61-25.) In that report, Master Furnari concluded at one point that "[i]n 2002[,] [Plaintiff's mother] admittedly was overwhelmed with caring for [Plaintiff]. Therefore, she shed her joint parental responsibility and turned the child over to [Plaintiff's father]."[1] (*Id.* at 13–14.)

However, at another point in the report, Master Furnari suggests that "[i]n 2003[,] the child [Plaintiff] went to live consistently with [his father]." (*Id.* at 4; *see also id.* at 10 (discussing circumstances that occurred "[w]hen the children were in [their father's] custody from 2003-2005.").) Thus, the Furnari Report does not definitively establish that Plaintiff did not reside at

---

[1] Notably, even if Plaintiff was in his father's custody in late 2002, a portion of Master Furnari's report suggests that Plaintiff's father "treated [the Property] as a flop house, where he could just drop the children off for any length of time[.]" (Furnari Report at 13.)

the Property during the time that it was owned (within the meaning of the Housing Code) by the FHLMC.

The FHLMC buttresses the Furnari Report by pointing to contemporaneous records from the Baltimore County Office of Housing that indicate Plaintiff's mother moved from the Property to a different residence, 1641 Dartford Road, on October 15, 2002. (Mot. Summ. J. Ex. 16, ECF No. 61-19.) It argues that these records establish that, even if Plaintiff's mother had physical custody of him in 2002, she was not living at the Property during the time that the FHLMC owned it.

Plaintiff rejoins that other evidence in this case contradicts this conclusion and suggests that Plaintiff resided at the property until early 2003. First, Plaintiff points to various records from his treatment at Johns Hopkins that list his address as the Property until January 27, 2003. (Opp. Summ. J. Ex. 11–16, ECF Nos. 62-14–62-19.)   Second, while Johns Hopkins did send correspondences to the 1641 Dartford Road address in late 2002, it appears that those correspondences were not received by Plaintiff's mother, as the record reflects that Plaintiff did not keep the appointments related to those correspondences. (*See* Opp. Summ. J. Mem. Supp. at 17–19 (collecting exhibits showing this pattern).) Third, Plaintiff's first cousin, Tiffany Walker, testified at her deposition that she "kn[ew Plaintiff] was living with us [at the Property] in 2003 up until we moved out." (Walker Dep. at 38, Opp. Mot. Summ. J. Ex. 25, ECF No. 62-28.)

Taken together, the evidence in this case establishes a disputed issue of fact regarding whether and to what extent Plaintiff was residing at the Property in late 2002 and early 2003. This genuine dispute of fact, combined with the Court's conclusion that the FHLMC could be considered the "owner" of the Property from October 18, 2002, requires the Court to deny summary judgment on the question of duty.

11

### B. Breach

While the Court concludes that Plaintiff has provided sufficient evidence that the FHLMC owed him a duty under the Housing Code as of October 18, 2002, Plaintiff has failed to provide similarly sufficient evidence of breach and causation and must therefore grant summary judgment to the FHLMC.

As to breach, the FHLMC argues that, even if Plaintiff has established that the FHLMC owed him a duty under the Housing Code, he has failed to show a breach of that duty. It points out that shortly after Plaintiff was diagnosed with elevated lead levels, both the Property and Plaintiff's father's home were inspected for lead violations. (*See* Mot. Summ. J. Exs. 5, 6, ECF Nos. 61-8, 61-9.) No violations were identified at the Property and testing of various surfaces at the Property conducted on August 22, 2002, concluded that "all areas tested are below pb threshold limit." (Mot. Summ. J. Ex. 5 at 6.) In contrast, a number of lead violations were identified at the home of Plaintiff's father. (*See* Mot. Summ. J. Ex. 6.)

Despite this, Plaintiff contends that there is a genuine dispute of material fact as to whether the Property was in violation of the Housing Code at the time it was acquired by the FHLMC. He relies on Section 703(b)(3) of the Code, which requires that "[a]ll walls, ceilings, woodwork, doors, and windows shall be kept clean and free of any flaking, loose, or peeling paint." Balt. City Code Art. 13 § 703(b)(3). In order to establish a genuine dispute of fact as to a violation of this section of the Housing Code, Plaintiff relies exclusively on the testimony of his first cousin, Ms. Walker. (*See* Opp. Mot. Summ. J. at 23–24.)

Ms. Walker, who lived at the Property at the same time as Plaintiff, affirmatively indicated that she "observed [ ] items that needed repair, including chipping, peeling, or flaking paint." (*See* Walker Dep. at 119.) Specifically, she identified the "bathroom and the hallway banister" as areas

that were in need of repair and that had "chipping paint." (*Id.* at 119–122.) She also testified that these areas were eventually repaired. (*Id.* at 128.) Importantly, nothing in Ms. Walker's testimony suggests that these issues remained uncorrected at the time that the FHLMC obtained the Property in October 2002. Indeed, to the extent that Ms. Walker attempted to identify a precise timeframe, her testimony is that both areas "were prepared [sic] like 2000, 2001[,]" that is, long before the foreclosure sale. (*Id.*)

Taking Ms. Walker's testimony in light of the other evidence in the case, such as the August 2002 report by the Baltimore City Housing Department that identified no lead paint violations at the Property, the Court cannot see how a reasonable fact-finder could conclude that the Property was in violation of the Housing Code at the time it was owned by the FHLMC. Summary judgment is appropriate on this failure of proof alone. *See Celotex Corp.*, 477 U.S. at 322–23 (concluding that where "a party [ ] fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . there can be 'no genuine dispute as to any material fact,' since a [ ] failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

### C. Causation

Plaintiff has also failed to establish the closely-related issue of causation, a deficiency in his case that would also independently warrant a grant of summary judgment to the FHLMC. Compounding Plaintiff's issues is that his proof on the causation point principally relies on unsworn expert reports to establish a genuine dispute of material fact. However, consideration of Plaintiff's expert reports would not alter the Court's conclusion as to the propriety of summary judgment, as—even considering the reports of Plaintiff's experts—he has failed to establish that

13

his exposure to lead at the Property during the time that the FHLMC owned the Property was the cause of the injuries alleged in this case.

### 1. Admissibility of Unsigned Expert Reports

As a general matter, "it is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment." *Solis v. Prince George's Cnty.*, 153 F. Supp. 2d 793, 798 (D. Md. 2001) (quoting *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)). In *Humphreys*, the Fourth Circuit noted an exception to this principle, explaining that a "court may consider . . . the content or substance of otherwise inadmissible materials where the 'party submitting the evidence shows that it will be possible to put the information into an admissible form.'" *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015) (cleaned up). Applying this reasoning, the Fourth Circuit concluded that it was not an abuse of discretion by the district court to consider an unsigned expert report because the proffering party "submitted declarations made 'under penalty of perjury' from the experts attesting that they 'would testify to the matters set forth in their respective reports.'" *Id.* at 539 (cleaned up). It made clear, however, that its "holding [did] not establish any *requirement* for the consideration of experts at summary judgment," but merely that it was permissible for a court to consider unsigned expert reports at summary judgment where there were alternative indicia that the contents of those reports would be admissible at trial. *Id.* at 539 n. 4 (emphasis added).

Despite *Humphreys*, courts in this District continue to decline to consider unsworn expert reports at the summary judgment stage. *See McDougald v. Pow*, Civ. No. SAG-17-2898, 2020 WL 6450281, at *5 (D. Md. Nov. 3, 2020); *Skanska USA Building, Inc. v. J.D. Long Masonry, Inc.*, Civ. No. SAG-16-0933, 2019 WL 3323210, at *2 n. 1 (D. Md. July 24, 2019); *Cf. AMBIMJB, LLC v. Strategic Armory Corps, LLC*, Civ. No. JKB-20-0807, 2021 WL 949376, at *8 (D. Md.

Mar. 12, 2021) (acknowledging exception but declining to consider report where "the Court has no way to assure itself that it will be possible to put [the expert report] into an admissible form") (internal quotation marks omitted); *but see Sparrow v. City of Annapolis (MD)*, Civ. No. WMN-16-1394, 2017 WL 3413596, at *5 (D. Md. Aug. 9, 2017) (considering unsigned expert report where party submitted a verifying affidavit). The Court is inclined to apply that practice here given that Plaintiff has provided no grounds for why he did not initially submit properly sworn expert reports.

To be clear, Plaintiff submitted not one, but several unsigned expert reports in his Opposition to Defendant's Motion for Summary Judgment. (*See* ECF Nos. 62-23, 62-24, 62-31, 62-36.) Only after the FHLMC moved to strike those exhibits did Plaintiff submit confirmatory affidavits—while providing no grounds for why post-facto correction was necessary or appropriate. (*See* ECF No. 70.) While these confirmatory affidavits "*can* cure the evidentiary issues posed by an unsworn report through subsequent verification or reaffirmation of an unsworn expert's report," permitting them to do so in this case would essentially eviscerate the requirement that expert reports be sworn in the first instance. *AMBIMJB*, 2021 WL 949376, at *8 (emphasis added) (quoting *Humphreys*, 790 F.3d at 539).

While the Court is certainly concerned by the cavalier attitude Plaintiff has shown to a straightforward evidentiary requirement, the consequence of that concern is not squarely presented in this case. For the reasons below, even if this Court were to consider the late-verified expert reports, Plaintiff has failed to establish a genuine dispute of material fact as to causation. *See infra* Part III.C.2. Accordingly, the Court will reserve judgment on the question of whether, in a closer case, Plaintiff's procedural errors would warrant striking the expert reports. *See McDougald*, 2020 WL 6450281, at *5 (noting that "unsworn expert reports are often excluded from consideration

when resolving a summary judgment motion" but declining to decide whether to exclude the expert report because the expert's "testimony . . . fail[ed] to address the primary deficiency in Plaintiff's case"). Instead, the Court will deny Defendant's Motions to Strike these reports as moot, because consideration of Plaintiff's expert reports would not alter the Court's conclusion as to the propriety of summary judgment. *Cf. AMBIMJB*, 2021 WL 949376, at \*8–\*9 (striking expert report that was not subsequently verified by affidavit and concluding that summary judgment would be appropriate even if stricken expert report was considered).

### 2. *Evidence of Causation*

The Maryland Court of Appeals has explained that causation in lead paint cases can be "conceived of as a series of links: (1) the link between the defendant's property and the plaintiff's exposure to lead; (2) the link between specific exposure to lead and the elevated blood lead levels; and (3) the link between those blood lead levels and the injuries allegedly suffered by the plaintiff." *Ross v. Housing Auth. of Balt. City*, 63 A.3d 1, 12 (Md. 2013). In this case, Plaintiff has failed to proffer sufficient evidence such that a reasonable fact finder could find that he had established the first two of those links. Accordingly, he has failed to establish a material dispute of fact as to whether his exposure to lead at the Property during the time that the FHLMC owned the Property was the cause of the injuries alleged in this case.

### a. *Lead Exposure at the Property*

There is no direct evidence that Plaintiff ingested lead at the Property during the time that it was owned by the FHLMC. Rather, Plaintiff presents various points of circumstantial evidence—the presence of lead paint at the Property, the state of the Property at the time of Plaintiff's residency, and Plaintiff's elevated blood-lead level while he resided at the Property. Plaintiff's expert, Dr. Alma Robinson-Josey, draws on these points to conclude that "to a

reasonable degree of medical probability [ ] Dante Savage was exposed to and ingested lead at [the Property] and 414 W. 28th Street." (Robinson-Josey Report at 5, Opp. Mot. Summ. J. Ex. 28, ECF No. 62-31.)

The Maryland Court of Appeals has confirmed that "circumstantial evidence may be used to establish a *prima facie* negligence case so long as the circumstantial evidence demonstrates that the subject property is a reasonable probable source of lead exposure." *Rowhouses, Inc. v. Smith*, 133 A.3d 1054, 1080 (Md. 2016). "[A]t the summary judgment phase, a reasonable probability requires a showing that is less than 'more likely than not,' but more than a mere 'possibility.'" *Id.* at 1080–81. While this can be done through circumstantial evidence, "[t]he case law is clear that, when . . . using circumstantial evidence to establish the subject property as a reasonable probable source of lead exposure—a plaintiff must rule out other reasonably probable sources." *Id.* at 1083. Plaintiff has not done so. Indeed, Plaintiff's expert specifically opines that Plaintiff was exposed to lead paint at *both* the Property and 414 W. 28th Street. This is insufficient to establish causation at summary judgment.

*Taylor v. Fishkind*, 51 A.3d 743 (Md. Ct. Spec. App. 2012), is instructive on this point. There, plaintiff claimed that she had been exposed to lead at a property located at 1025 N. Carrollton Avenue. *Id.* at 748. She also "asserted that the age of the house, the discovery of lead-based paint on the exterior of the house, and testimony from [plaintiff's] mother that the house had chipping and peeling paint established a sufficient factual basis for a trier of fact to infer that [plaintiff] was exposed to lead-based paint [at the house]." *Id.* at 751. Plaintiff's expert concluded that, based on this evidence, plaintiff "was exposed to lead at the 1025 N. Carrollton Avenue dwelling and at [another dwelling]." *Id.* at 748.

17

Assessing whether this evidence established causation, the Maryland Court of Special Appeals held that "[b]ecause [plaintiff] claims that she was exposed to lead-based paint at two properties" her "evidentiary showing is insufficient to prove that 1025 N. Carrollton Avenue was *the only possible source* of [her] elevated blood lead level." *Id.* at 758 (emphasis in original). Rather, "more [was] required to support [plaintiff's expert's] opinion that [plaintiff] was exposed to lead-based paint at 1025 N. Carrollton Avenue because . . . [plaintiff] could not rule out all other sources for her lead exposure." *Id.*

The evidence produced in this case does not have the "more [that] is required" under *Taylor. Id.* Rather, the evidence militates against the conclusion that the Property was a reasonable probable source of Plaintiff's lead exposure. At the time Plaintiff was diagnosed with an elevated lead level, the Health Department inspected both properties where he spent significant time. While the Health Department found that the Property had trace levels of lead, it found that Plaintiff's father's house had dozens of lead-paint related Housing Code violations. (*See* Mot. Summ. J. Exs. 5, 6.) Contemporaneous medical records confirm the disparity between the two homes. Progress notes from Johns Hopkins dated September 17, 2002, explain that "Dad's house tested positive. Visits have stopped." (Opp. Mot. Summ. J. Ex. 7.) In contrast, notes from the Mt. Washington Pediatric Hospital explain that "[a]t the time of discharge, the mother reported that the patient was going to go to 2419 Keyworth Avenue, Baltimore, Maryland 21215, but since [the Property] was considered lead-safe, they returned there once cleaning was completed." (Mot. Summ. J. Ex. 15; *see also*, Robinson-Josey Report at 3 ("An alternative plan was for [Plaintiff] to be discharged to the home of a family friend at 2425 Keyworth Avenue if home residency not clear at the time of discharge, but mom states that [Plaintiff] never resided at this property.").) Far from shoring up

the inference that the Property was a reasonable probable source of lead exposure, all evidence suggests the opposite—that Plaintiff's lead exposure occurred at 414 W. 28th Street.

### b. Link Between Lead Exposure and Elevated Blood Lead Levels

Plaintiff's attempt to establish causation is also defeated at the second link, which requires him to show a connection between exposure to lead at the Property at the time that the FHLMC owned it and Plaintiff's injuriously elevated blood-lead level. *See Ross*, 63 A.3d at 12. At the time that the FHLMC obtained ownership of the Property (October 18, 2002), Plaintiff had already been diagnosed with plumbism (August 16, 2002), and undergone chelation therapy (ending September 9, 2002). (*See* Mot. Summ. J. Ex. 24 at 2; *see also* Opp. Mot. Summ. J. Ex. 7 at 1 ("Pt. treated at MWPH from 8-22-02 to 9-9-02 for Pb toxicity.").) His blood-lead level had dropped from a high of 58 mcg/dl in August 2002 down to 19 mcg/dl by September 24, 2002. (Mot. Summ. J. Ex. 24 at 2.) Additional testing during the FHLMC's ownership showed a continuing decrease of his blood-lead level, down to 14 mcg/dl on January 27, 2003. (*Id.*) Although Plaintiff was monitored during this time-period, it does not appear that he received any further medical intervention after being discharged on September 9, 2002. (*See* ECF Nos. 62-15–62-19 (Johns Hopkins progress notes during the FHLMC's ownership).)

To sufficiently establish causation at summary judgment, Plaintiff must establish that his lead exposure during the time the Property was owned by the FHLMC "*by itself*, was a substantial causation factor of [Plaintiff's] lead poisoning." *Johnson v. Rowhouses, Inc.*, 707 A.2d 933, 941 (Md. Ct. Spec. App. 1998) (emphasis in original) (quoting *Bartholomee v. Casey*, 651 A.2d 908, 920 (Md. Ct. Spec. App. 1994)). That is, Plaintiff must provide evidence suggestive that his injuries were caused in substantial part by lead exposure in the three-month window that he resided at the Property while it was owned by the FHLMC. *Id.* (granting summary judgment where expert

report did "not even mention the five-month window [that defendant owned the property and] focuse[d] entirely on the ten-month period [plaintiff] lived on the premises"). Neither Dr. Robinson-Josey's report, nor her deposition testimony, attempt to disaggregate Plaintiff's lead exposure to make this required showing of causation.

Rather, Dr. Robinson-Josey's conclusion in her report is that Plaintiff "was exposed to and ingested lead at 2304 E. Lafayette Avenue [i.e., the Property] and 414 W. 28th Street" and that he sustained injuries as a result of these exposures. (Robinson-Josey Report at 5.) Her testimony similarly aggregates the sources of the lead exposure, describing them as "the most likely sources of the child's exposure" but declining to assign specific causation to any particular property. (Robinson-Josey Dep. at 401.)

Indeed, the reasonable inferences to be drawn from Dr. Robinson-Josey's testimony contradicts Plaintiff's theory that exposure to lead at the Property after September 2002 was a source, much less a significant causal source, of Plaintiff's lead poisoning. First, Dr. Robinson-Josey's testimony explains that Plaintiff's contemporary symptoms (such as trouble balancing) began to recede as "his lead levels had started to continually decline," around September 2002, suggesting that Plaintiff was actually improving during the time that the FHLMC owned the Property. (*Id.* at 415–16.) Second, Dr. Robinson-Josey explained that the protocol prescribed by the Centers for Disease Control and the Academy of Pediatrics required treating physicians to "identify the source of [lead] exposure in order to try to remove the child from the source or to intercede to mitigate the[ ] exposure the child would have at the source." (*Id.* at 398.) Applying these standards to Plaintiff's medical history suggests that the Property was not a significant concern when Plaintiff was discharged, as he was permitted to return to the Property and remained there potentially until early 2003. In sum, there is no "expert testimony that exposure during [the

20

window the FHLMC owned the Property], *by itself*, was a substantial causation factor of [Plaintiff's] lead poisoning." *Johnson*, 707 A.2d at 941. The absence of this evidence would require "the jury to speculate as to the impact of exposure during that period" and is insufficient to establish a genuine dispute of fact as to causation. *Id.*

At bottom, "[t]he pertinent question to be asked is whether the particular circumstantial evidence permits an inferences or inferences of the desired ultimate fact or facts as a 'reasonable likelihood or probability,' and not a mere 'possibility.'" *Hamilton v. Kirson*, 96 A.3d 714, 739 (Md. 2014). Plaintiff's theory of causation asks the fact-finder to make two key but counterintuitive inferences. First, that Plaintiff's lead exposure occurred, at least in substantial part, at the Property. This inference would have to be drawn in spite of the Property being declared lead-safe and in spite of Plaintiff spending significant amounts of time at 414 W. 28th Street, a dwelling found to have dozens of lead-paint violations. Second, a fact-finder would be required to conclude that Plaintiff's lead exposure at the Property from October 18, 2002 to January 2003, a time when Plaintiff's blood-lead levels were declining and far lower than in prior months, was—standing alone—a substantial cause of his injuries. *Johnson*, 707 A.2d at 941. There is simply no testimony or other evidence in the record from which a reasonable fact-finder could draw these facially implausible inferences. In short, Plaintiff has not provided "additional evidence that elevates the mere chance that the property contained lead-based paint and was a source of lead exposure to the fair likelihood that the property contained lead-based paint and was a source of lead exposure." *Smith*, 133 A.3d at 1082. This failure of proof requires the Court to grant summary judgment in favor of the FHLMC.

In conclusion, while Plaintiff has established that the FHLMC owed him a duty from the time the foreclosure sale was ratified on October 18, 2002, he has failed to show that the FHLMC

21

breached that duty or that any breach of that duty by the FHLMC was the cause of his injuries. Although some testimony suggested the Property had peeling or flaking paint, that testimony suggested those problems were remedied long before Plaintiff's plumbism diagnosis. Indeed, a contemporary inspection of the Property triggered by that diagnosis identified no violations and only trace amounts of lead that were below hazard levels. Plaintiff's treating physicians concluded this evidence was sufficient to permit Plaintiff to return to the Property and reside there for several months following his chelation therapy.

Further, the critical period of Plaintiff's lead poisoning occurred in August and early September 2002, more than a month before the FHLMC obtained ownership of the Property. By October 2002, it appeared that Plaintiff's lead levels were steadily declining and that he was being monitored, but not actively treated, for lead exposure. While Plaintiff certainly may have continued to experience the lingering effects of his acute lead poisoning while residing at the Property while it was owned by the FHLMC, there is no testimony that this period presented an independently sufficient cause for Plaintiff's injuries.

The flaws in Plaintiff's proof against the FHLMC are rendered even more stark by the fact that Plaintiff was spending a substantial amount of time at a residence with dozens of identified lead violations at the time he was diagnosed with plumbism. These key factual deficiencies, individually and in aggregate, would preclude any reasonable fact-finder from concluding that the FHLMC negligently breached a duty owed to Plaintiff or that any such breach was the cause of Plaintiff's injuries. Accordingly, the Court will grant the FHLMC summary judgment as to Plaintiff's final remaining claim in this case.

## IV.    *Conclusion*

For the foregoing reasons, an order shall enter: (1) granting the FHLMC's Motion for Summary Judgment (ECF No. 61); (2) granting the FHLMC's unopposed Motion to Strike the Affidavit of Theatra Bowman (ECF No. 63); and (3) denying as moot the FHLMC's Motion to Strike Unsworn and Inadmissible Expert Reports (ECF No. 64).

DATED this __16__ day of November, 2021.

BY THE COURT:

James K. Bredar

Chief Judge